# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| |  |
|---|---|
| JUSTIN C. MUSTAFA,<br>　　　*Plaintiff*,<br><br>　　　v.<br><br>CHRISTOPHER BYARS,<br>　　　*Defendant.* | No. 3:19-cv-1780 (VAB) |

## RULING AND ORDER ON MOTION FOR DISCLOSURE

Justin Mustafa ("Plaintiff"), an individual formerly incarcerated at Garner Correctional Institution ("Garner") in the custody of the Department of Correction ("DOC") sued Correction Officer Christopher Byars ("Defendant") under 42 U.S.C. § 1983 for excessive force and assault under Connecticut state law.[1]

After a four-day trial, a jury found that Officer Byars violated Mr. Mustafa's Eight Amendment rights through use of excessive force and subjected Mr. Mustafa to assault.

After the conclusion of trial, the ACLU of Connecticut ("ACLU") moved to intervene to obtain copies of video exhibits played in open court during trial. Emergency Motion to Intervene for Immediate Disclosure of Judicial Documents, ECF No. 137 (Dec. 16, 2024) ("Mot.").

For the following reasons, the ACLU's motion for disclosure is **GRANTED** in part and **DENIED** in part.

The parties are ordered to allow the ACLU to view the requested exhibits, Pla-1, Pla-1-a, Def-H, Def-I, Def-J, and Def-K, in a reasonable manner consistent with this Ruling and Order no later than **March 31, 2025**.

---

[1] Mr. Mustafa also brought a claim under Section 1983 for deliberate indifference to his medical needs. The jury, however, did not find that Officer Byars demonstrated deliberate indifference to Mr. Mustafa's serious medical needs.

I.      FACTUAL AND PROCEDURAL BACKGROUND

   A. Factual Allegations

On May 25, 2019, Mr. Mustafa alleges that Officer Byars stabbed his hand with a key while Mr. Mustafa held his hand and arm over a food trap door in his cell in the Foxtrot Unit, a restrictive housing unit at Garner.

At trial on September 30, 2024, the Defendant played various video exhibits depicting the Foxtrot Unit, a restrictive housing unit, and other areas of Garner on May 25, 2019.

The videos shown at trial did not depict the use of force that formed the basis of Mr. Mustafa's claims. *See* Sept. 30, 2024 Tr. at 52, ECF No. 124 (Q: . . . The video we just saw as Exhibit 1, did it depict the interaction that you and Justin had at the cell? A. Only from my end. Q. We can't see in the video what actually happened with respect to his hands and your hands and, you know, what happened with the trap; is that fair? A. Correct. Q. Are you aware of any other video that does depict his hand and yours striking him in his hand? A. No.).

All of the videos were admitted through the parties' agreement, and none were submitted under seal.

   B. Procedural History

The trial occurred from September 30, 2024, to October 3, 2024. Min. Entry, ECF No. 107 (Sept. 30, 2024); Min. Entry, ECF No. 108 (Oct. 1, 2024); Min. Entry, ECF No. 109 (Oct. 2, 2024); Min. Entry, ECF No. 110 (Oct. 3, 2024).

On October 3, 2024, the jury returned a verdict for the Plaintiff as to Plaintiff's excessive force and state law assault claims, and for the Defendant as to Plaintiff's deliberate indifference claim. Jury Verdict, ECF No. 111.

On October 21, 2024, the Court entered judgment in favor of the Plaintiff. Judgement, ECF No. 117.

On November 14, 2024, the ACLU requested copies of the video exhibits played at trial from the Clerk of Court's office, who informed the ACLU that the exhibits had been returned to the parties. Decl. of Dan Barrett, ECF No. 137-1 (Dec. 16, 2024) at ¶ 2.

On November 18, 2024, the ACLU spoke to a supervisor at the Clerk of Court's Office who informed the ACLU that it would investigate and return their call. *Id.* at ¶ 4–5.

On November 22, 2024, the ACLU again contacted the Clerk of Court's Office and left a voicemail message regarding its request. *Id.* at 6–7.

On December 4, 2024, the ACLU submitted a letter to Chief Judge Micheal P. Shea requesting copies of video exhibits played at trial. *See* Order, ECF No. 135 (Dec. 9, 2024).

On December 9, 2024, the Court ordered the parties to file responses outlining their positions by January 10, 2025. *Id.*

On December 16, 2024, the ACLU filed an emergency motion to intervene and for immediate disclosure of the requested exhibits. Mot.

On December 17, 2024, the Court ordered an expedited briefing schedule for the emergency motion. Order, ECF No. 140 (Dec. 17, 2024).

On December 18, 2024, Mr. Mustafa took no position with respect to the ACLU's request. Resp. re Emergency Mot., ECF No. 141 (Dec. 18, 2024).

On December 20, 2024, the Defendant objected to the ACLU's motion to intervene and request to obtain video exhibits. Obj. re Emergency Mot., ECF No. 142 (Dec. 20, 2024) ("Obj.").

On December 23, 2024, the ACLU submitted a reply. Reply, ECF No. 143 (Dec. 23, 2024) ("Reply").

On December 24, 2024, the Court granted the ACLU's motion to intervene, and took the remainder of the motion for immediate disclosure under advisement until the Defendant supplemented its current response. Order, ECF No. 144 (Dec. 24, 2024).

On January 10, 2025, the Defendant filed a supplemental response to the ACLU's motion. Second Obj. re Emergency Mot., ECF No. 152 (Jan. 10, 2025) ("First Supp. Obj.").

On January 13, 2025, the Court held a hearing on the ACLU's motion for disclosure and ordered supplemental briefing. Min. Entry, ECF No. 155 (Jan. 13, 2025).

On January 20, 2025, the Defendant submitted a supplemental response to the ACLU's motion for disclosure. Response re Motion Hearing, ECF No. 157 (Jan. 20, 2025) ("Second Supp. Obj.").

On January 21, 2025, the Defendant submitted an affidavit from William Mulligan, the Deputy Commissioner for Operations and Rehabilitative Services for DOC. Affidavit, ECF No. 158 (Jan. 21, 2025) ("Mulligan Decl.").

On January 27, 2025, the ACLU submitted a reply to the Defendant's supplemental response. Response, ECF No. 160 (Jan. 27, 2025) ("Supplemental Reply")

## II.     STANDARD OF REVIEW

### A.  Common Law Right of Access to Judicial Documents

"The common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). "The presumption of access is based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice. . . . Without monitoring, moreover, the

4

public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings." *Id.* (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir.1995)).

"Adjudicating a claim regarding the common law right of public access is a three-step process." *United States v. Akhavan*, 532 F. Supp. 3d 181, 184 (S.D.N.Y. 2021). First, "a court must first conclude that the documents at issue are indeed 'judicial documents.' . . . In order to be designated a judicial document, the item filed must be relevant to the performance of the judicial function and useful in the judicial process." *Lugosch*, 435 F.3d at 119 (citation and internal quotation marks omitted). "[T]he common law right to inspect and copy judicial records applies to *any* item entered into evidence at a public session of a trial, excluding only those items entered under seal." *Application of CBS, Inc.*, 828 F.2d 958, 959 (2d Cir. 1987) (emphasis in original) (citation and internal quotation marks omitted).

Second, the court "must determine the weight of [the] presumption [of access]." *Lugosch*, 435 F.3d at 119. In so doing, the court should consider "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Id.* (citing *Amodeo*, 71 F.3d at 1049).

Third, "the court must 'balance competing considerations against [the weight of the presumption of access].'" *Id.* (citing *Amodeo*, 71 F.3d at 1050). "Such countervailing factors include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.'" *Id.* (citing *Amodeo*, 71 F.3d at 1050). For example, the Second Circuit has recognized certain privacy concerns unique to video evidence that may be widely disseminated on the internet. *Mirlis v. Greer*, 952 F.3d 51, 56 (2d

5

Cir. 2020) ("[T]he District Court undervalued the weight properly accorded the intense intrusion on Hack's privacy interests that the internet publication of the video excerpts would effect. Today, unlike in the era of our decision in *CBS*, videos of all types are routinely and widely shared on the Internet, where (as far as we can predict now) it appears they will be available in perpetuity for unlimited viewing, further dissemination, and easy manipulation; their subjects are unable to escape them.").

### B. First Amendment Right of Access to Judicial Documents

"In addition to the common law right of access, it is well established that the public and the press have a 'qualified First Amendment right to attend judicial proceedings and to access certain judicial documents.'" *Lugosch*, 435 F.3d at 120 (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir.2004)). The Second Circuit has "concluded that the First Amendment guarantees a qualified right of access not only to criminal but also to civil trials and to their related proceedings and records." *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 298 (2d Cir. 2012).

The Second Circuit has "applied two different approaches when deciding whether the First Amendment right applies to particular material." *Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156, 164 (2d Cir. 2013). Under the "experience-and-logic" approach, "[which] applies to both judicial proceedings *and* documents," the court must "ask[] 'both whether the documents have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question.'" *Id.* (quoting *Lugosch*, 435 F.3d at 120) (emphasis in original). "The second approach—which [courts] adopt only when analyzing judicial documents related to judicial proceedings covered by the First Amendment right—asks whether the documents at issue 'are derived from or are a necessary

6

corollary of the capacity to attend the relevant proceedings.'" *Id.* (quoting *Lugosch*, 435 F.3d at 120).

"Documents to which the public has a qualified right of access may be sealed only if 'specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *United States v. Aref*, 533 F.3d 72, 82 (2d Cir. 2008) (quoting *Press-Enterprise Co. v. Superior Court of California for Riverside County*, 478 U.S. 1, 13–14 (1986)). "Broad and general findings by the trial court, however, are not sufficient to justify closure." *Lugosch*, 435 F.3d at 120 (quoting *In re New York Times Co.*, 828 F.2d 110, 113 (2d Cir.1987)).

### III. DISCUSSION

The ACLU argues that because the exhibits it seeks access to were played in open court and not sealed, they are entitled to access to the videos under both the common law and First Amendment.[2] Mot.

In response, the Defendant argues that the ACLU's request is untimely and that the Court lacks jurisdiction over the ACLU's motion to intervene. Obj. at 3; Supp. Obj. at 2–8. The Defendant further argues that because the videos depict the inside of the restrictive housing unit of Garner, the disclosure of the video to the public would implicate serious safety and security concerns. Obj. at 6; *see also* First Supp. Obj. at 9–11.

The Court will first address the procedural arguments, and then addresses the merits of the motion for disclosure of the video exhibits shown at trial.

---

[2] The ACLU seeks access to Plaintiff's Exhibits 1 and 1a and Defendant's Exhibits H, I, J, and K.

7

### A. The Procedural Arguments

Rule 24 of the Federal Rules of Civil Procedure states: "[o]n timely motion, the court must permit anyone to intervene who" either:

> (a) . . . (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest. [or]
>
> (b) (1) . . . (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact.

Fed. R. Civ. P. 24(a)–(b).

"[T]he determination of the timeliness of a motion to intervene is within the discretion of the district court, 'evaluated against the totality of the circumstances before the court.'" *D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001) (quoting *Farmland Dairies v. Comm'r of the N.Y. State Dep't of Agric. and Markets*, 847 F.2d 1038, 1043–44 (2d Cir.1988)); *see also Dow Jones & Co. v. U.S. Dep't of Just.*, 161 F.R.D. 247, 251 (S.D.N.Y. 1995) ("Courts have not imposed a hard and fast rule defining timeliness under Rule 24(a), preferring instead, as discussed above, that the ruling be based on all the circumstances of the case.") "Circumstances considered in this determination include: '(1) how long the applicant had notice of the interest before [he] made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness.'" *D'Amato*, 236 F.3d at 84 (quoting *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir.1994)) (alterations in original).

The Defendant argues that the Court lacks jurisdiction over the ACLU's motion for disclosure because (1) there is no case or controversy, as the case has proceeded to final judgment, (2) the Defendant does not possess or control the videos, which belong to DOC, and

8

(3) the Eleventh Amendment bars the relief as the State of Connecticut and its agencies are the real parties in interest. Supp. Obj. at 2–8. The Defendant also argues that the ACLU's request is untimely because it failed to make a request within 30 days of trial, the timeframe in which the Court maintains custody of trial exhibits. Obj. at 3.

    The Court disagrees.

    First, the Court has jurisdiction over this matter. As the Court stated in its previous Order,

> [T]he ACLU has satisfied the standards set forth for mandatory intervention, having shown through the filing of a "timely motion," Fed.R.Civ.P.24(a), "an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties represent that interest." *Id*.; *Catanzano v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996) ("In order to intervene as of right under Fed.R.Civ.P. 24(a)(2), an applicant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action. Failure to satisfy any one of these requirements is a sufficient ground to deny the application." (citation omitted)). In any event, even if mandatory intervention is not appropriate, at a minimum, permissive intervention would be because of the "claim," Fed. R. Civ. P. 24(b), made here, regarding the relevant documents. Accordingly, the ACLU is permitted to intervene in this case.

Order, ECF No. 144.

    As to the Defendant's arguments that he does not possess the video exhibits and the real party in interest is the DOC, these arguments lack merit. Under this District's Local Rules, parties are required to retain trial exhibits "until final determination of the action, including the date when the mandate of the final reviewing court has been filed or until the time for appeal has expired." D. Conn. L. Civ. R. 83.6. As discussed above, at the time the ACLU filed its motion, the Defendant's motion for a new trial was pending, and the case had not yet reached a final determination. As a result, the video exhibits remained in the custody and control of the Defendant, irrespective of whether the videos—which the Defendant introduced and relied upon at trial—were "on loan" from the DOC.

9

The ACLU also timely filed its motion, having filed it while the Defendant's motion for a new trial was still pending, *see* Mot. for a New Trial, ECF No. 120 (Oct. 31, 2024), and before the parties had reached a settlement agreement resolving the case, *see* Minute Entry, ECF No. 147. In addition, the ACLU contacted the Clerk of Court's Office to obtain the video evidence approximately forty-two days after the jury returned a verdict, and less than a month after the Clerk of Court entered judgment in favor of the Plaintiff. Considering the ACLU's prompt request for the video exhibits after the close of trial, and the parties' ongoing motions and settlement discussions at the time the ACLU filed its motion to intervene, there is no legitimate issue with respect to timeliness.

Accordingly, the ACLU timely filed its motion and the Court has jurisdiction over this aspect of the case.

### B. Access to Video Exhibits at Trial

The right of access under either the common law or the First Amendment is not absolute. *United States v. Suarez*, 880 F.2d 626, 631 (2d Cir. 1989) ("The right of access, . . . , is a qualified one; it is not absolute."); *United States v. Giordano*, 158 F. Supp. 2d 242, 244 (D. Conn. 2001) ("There is also no question that the public's and the media's right of access is not absolute."). Nor is immediate disclosure mandated once the presumption of access attaches. *See United States v. Park*, 619 F. Supp. 2d 89, 93 (S.D.N.Y. 2009) ("The applicability of the First Amendment, however, is not dispositive. If the right of access applies, the proceedings or documents are not automatically made public."). Rather, under the common law, there must be a "balance [of] competing considerations" such as "'the danger of impairing law enforcement or judicial efficiency'" and "'the privacy interests of those resisting disclosure.'" *Lugosch*, 435 F.3d at 120 (citations omitted). And, under the First Amendment, there must be consideration as to

10

whether "disclosure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* (citation and internal quotation marks omitted).

The ACLU argues that "[t]he exhibits at issue here were played in open court, and are therefore judicial documents to which the public has the strongest right of access." Mot. at 6. The ACLU further argues that because the videos have not been sealed "in whole or part, and no party has so much as *asked* the Court to do so" it is entitled to immediate access. Mot. at 9 (emphasis in original) (quoting *United States v. All Funds on Deposit at Wells Fargo Bank in San Francisco, California, in Acct. No. 7986104185*, 643 F. Supp. 2d 577, 585 (S.D.N.Y. 2009) ("The Court is required to order disclosure absent compelling reasons to deny access and even then must employ the least restrictive possible means of doing so.")).

In response, the Defendant argues that the parties retained the videos subject to a protective order "given the obvious safety and security concerns that come with videos depicting the insides of prisons." Obj. at 4. The Defendant argues that because the videos "show the inside of the Garner prison, [and] its restrictive housing unit" and "include[s] showing where blind spots are located," and "the layout of the prison facility as people walk through different parts of Garner" there are safety and security concerns with the disclosure of the video exhibits to the public. Obj. at 6; *see also* First Supp. Obj. at 9–11 (detailing specific aspects of prison processes and layouts, and individual privacy concerns depicted in video exhibits).

In his second supplemental objection, the Defendant argues that "the risk and potential injury are serious" in this case, given "the concern of the internet era [] that once a video is posted on the internet . . ., it is permanent." Second Supp. Obj. at 4–5 (citing *Mirlis*, 952 F.3d at 65). The Defendant argues that the videos should either be sealed, or the ACLU should only be allowed access to them in a supervised setting. *Id.* at 5.

11

In reply, the ACLU argues that the Defendant fails to meet his burden in showing that the common law and First Amendment right of public access has been overcome. The ACLU argues that the protective order between the parties does not account for the right of public access to documents actually introduced at trial. Reply at 4. The ACLU also argues that the Defendant "'greatly diminished' any sealing interests by playing the videos for the public at trial." *Id.* at 6 (quoting *Olson v. Major League Baseball*, 29 F.4th 59, 91–92 (2d Cir. 2022)).

In its supplemental response, the ACLU further argues that the Second Circuit's decision in "*Mirlis v. Greer* was purely a common law access dispute, with no party 'rely[ing] on a constitutional analysis in support of its position' and the Court of Appeals therefore applying only the common law." Supp. Reply at 1 (quoting *Mirlis*, 952 F.3d at 59 n.5). The ACLU contends that sealing the videos "fails narrow tailoring because (1) less-restrictive means of preventing incarcerated people from seeing the trial exhibits exist, and, (2) restricting the public's access to the exhibits is a wildly overinclusive way of preventing incarcerated people from seeing them." Supp. Reply at 2–3.

In particular, the ACLU argues that "DOC has no interest in barring the world from seeing on video what incarcerated people can already see daily, it has failed to show that the six year-old information is not stale, and it has not demonstrated that the videos depict occurrences that were private in intensely personal subject matter as distinct from merely having transpired behind the necessarily closed doors of a prison." Supp. Reply at 11.

The Court disagrees, at least in part.

The exhibits at issue here, which were not sealed (nor were efforts made to seal them before trial), and were shown in open court at trial, are judicial documents entitled to a strong presumption of access under both the common law and the First Amendment. *See Amodeo*, 71

F.3d at 1049 ("[T]he public has an 'especially strong' right of access to evidence introduced in trials.").

Here, although the ACLU has a right to view the video exhibits shown at trial, "countervailing factors" weigh against unfettered access to these videos. The videos at issue depict the inside of the restrictive housing unit of "a Level 4, High-Security correctional facility." Mulligan Decl. ¶¶ 11, 15. Deputy Commissioner Mulligan's affidavit claims that "there are numerous blind spots that are detectable, especially for the stationary cameras in Exhibits 1, la, J, and K[,]" and "in addition to blind spots, viewing of the videos also reveals or demonstrates visibility capabilities (or lack of capabilities) that can then be used improperly or form the basis for safety or security risks." *Id.* ¶ 15. He further states that Exhibits H and I "show[] the setup and other aspects of transports or preparation for transport to outside medical hospitals" and claims that "transportation to outside medical hospitals specifically have raised especially heightened concerns from a security and safety standpoint for [himself], DOC, and its officials." *Id.* ¶ 18. He concludes that "unrestricted providing of copies of the videos (Exhibits 1, 1 a, H, I, J, and K) to the [ACLU] or other groups, entities, or persons, who could then study them or post them online resulting in even further unsupervised viewing and studying of the videos-would further compound and increase the risks to DOC inmates and staff." *Id.* ¶ 23.

Courts in this Circuit have found that safety and security concerns warrant sealing videos depicting the layout and security procedures of correctional facilities. *See Boland v. Wilkins*, No. 3:18CV1958 (MPS), 2020 WL 550647, at *2 (D. Conn. Feb. 4, 2020) (granting motion to seal videos depicting the "layout of the Cheshire Correctional Institution and security procedures . . . [where] one of the videos implicates the plaintiff's medical privacy concerns." (citing *Gulley v. Semple*, No. 3:16-CV-425 (MPS), 2017 WL 1025168, at *2 (D. Conn. Mar. 16, 2017) (granting

13

motion to seal video where "the disclosure of the recordings to the public would reveal security procedures and the interior design of the correctional facility" so "that disclosure of this information to the public could endanger institutional safety and security")); *Virgil v. Finn*, No. 22 CIV. 3169 (CS)(JCM), 2025 WL 694450, at *5 (S.D.N.Y. Mar. 3, 2025) ("Here, the videos depict the internal layout of the prison and show several officers and inmates who are not parties to the action, thus, posing a risk to the safety and security of the prisons.").

Sealing of the videos, however, is not warranted in this case. Regardless of whether sealing might have been justified earlier in the litigation, preventing the ACLU from accessing videos provided to the public during trial—when the parties did not seek to seal the videos—would undermine the "potent and fundamental presumptive right of public access" afforded to exhibits shown at trial. *Mirlis*, 952 F.3d at 58. As a result, the ACLU must be provided the opportunity to view the requested video exhibits in a reasonable setting, and be allowed equal access to the videos as that of a member of public viewing the videos at trial. The ACLU may not, however, retain copies of the video exhibits.

This approach is not simply "sealing by a different name." Reply at 4. But, consistent with Second Circuit precedent, proper consideration of the risk of widespread dissemination of sensitive videos depicting blind spots and security protocols of a correctional facility that can be viewed by anyone, anywhere, at any time. *See Mirlis*, 952 F.3d at 61 ("[T]he Internet's rise over the last 30 years has had tremendous implications for the ease and immediacy of access to videos, as well as the permanence of those videos.").

Given that the videos requested do not depict the act of excessive force and assault that underlie Mr. Mustafa's claims, the potential benefit of the ACLU retaining copies of such videos, as opposed to merely viewing the videos, is minimal compared to the significant safety

14

and security risks of the "widespread and likely permanent dissemination" of sensitive videos depicting the layout and security procedures of correctional facilities. *See Mirlis*, 952 F.3d at 67 ("Only rarely will voluntary provision of sensitive evidence reasonably be understood to constitute consent to the widespread and likely permanent dissemination of a visual digital record of the formal *encounter* through which that evidence was given, when the encounter itself is not the allegedly critical act." (emphasis in original)).

While the Second Circuit's decision in *Mirlis* did not consider the First Amendment right to access, Supp. Reply at 1, its reasoning is consistent with how courts have evaluated limitations to the right to access under the First Amendment. Certainly "[t]he First Amendment demands broader *disclosure* than the common law." *In re NBC Universal, Inc.*, 426 F. Supp. 2d 49, 56 (E.D.N.Y. 2006) (emphasis in the original). "It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Nixon v. Warner Commc'ns*, Inc., 435 U.S. 589, 598 (1978) ("*Warner Communications*"); *see also In re NBC Universal, Inc.*, 426 F. Supp. 2d at 56 (citing *In re Providence J. Co., Inc.*, 293 F.3d 1, 16 (1st Cir. 2002) ("[T]he Court [in *Warner Communications*] rejected the argument that the First Amendment right of access allowed the media to obtain copies of tapes that had been entered into evidence at a criminal trial. . . . By affording interested members of the media ample opportunity to see and hear the tapes as they are played for the jury, the court has fulfilled its pertinent First Amendment obligations."); *United States v. Beckham*, 789 F.2d 401, 409 (6th Cir. 1986) ("This passage [of *Warner Communications*] indicates clearly that there is a difference between an opportunity to hear the tapes and access to the tapes themselves."). Given the security concerns discussed above,

15

providing the ACLU access to the exhibits equal to that afforded to members of the public in open court is sufficient to vindicate the public's right of access to exhibits shown at trial.[3] *See Warner Commc'ns, Inc.*, 435 U.S. at 610 ("The requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed.").[4]

Here, the videos do not show the force found to be excessive by the jury, and transcripts provide another means of obtaining relevant information contained in the videos. *See Doe v. New York Univ.*, No. 1:20-CV-1343 (MKV), 2023 WL 2609315, at *3 (S.D.N.Y. Mar. 22, 2023) ("The use of a transcript allows the public to obtain the relevant information in some form, while avoiding the very real threat to the privacy of Plaintiff, Jane, or both that making the actual videos public could cause."). In addition, the ACLU must be permitted to view the videos in their entirety, thereby allowing any relevant information not otherwise captured in the transcripts to be viewed. As a result, allowing the ACLU to view the videos, but not obtain copies of the videos, is a "narrowly tailored" means to serve the safety and security interests discussed above. *See Press-Enterprise*, 478 U.S. at 9–10 ("The presumption [of right to access] may be overcome

---

[3] Significantly, the ACLU relies on a number of cases which preceded, and therefore did not consider the technological advancement of the internet and the potential for widespread, permanent dissemination of video evidence containing sensitive information. *Mirlis*, 952 F.3d at 66 ("But we must also acknowledge what has changed since we decided *CBS* in 1987: The astonishing and pervasive rise of the Internet; the attendant ease with which videos may be shared worldwide by individuals; and the eternal digital life with which those videos are likely endowed by even a single display online. These are all factors that multiply and intensify the privacy costs to the individual of releasing sensitive videos; those costs are undeniably greater than what they might have been 30 years ago.")

[4] The ACLU also argues that alternate means exist for "restricting the public's access to the videos," such as the DOC's rules forbidding incarcerated people from obtaining or possessing the exhibits and criminal prohibitions on escape from or disorder within a prison. Supp. Reply at 3–9. Yet, under this standard, the result would be unfettered access to any video footage in any prison facility in nearly every case involving a correctional facility. Given the number of prison-related cases on the District of Connecticut's current docket, *see* Federal Judicial Caseload Statistics, U.S. District Courts—Civil Cases Filed, by Jurisdiction, Nature of Suit, and District (2024) (Table C-3) (reporting approximately 300 cases filed by prisoners regarding prison conditions and civil rights during the 12-month period ending March 31, 2024 in the District of Connecticut), and the various issues raised in them, it is not clear what aspects of a correctional facility, if any, would not be subject to constant public view.

only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." (citation omitted)); *New York C.L. Union*, 684 F.3d at 296 ("[T]he First Amendment right of access . . . does not foreclose the possibility of *ever* excluding the public. What offends the First Amendment is the attempt to do so without sufficient justification." (emphasis in original)).

Accordingly, while the First Amendment and common law right to access require that the ACLU be afforded an opportunity to view the video exhibits in a manner equal to that of a member of the public viewing the exhibits at trial, copies of the video exhibits for permanent retention and unfettered use need not be provided due to the safety and security concerns related to the operation of a correctional facility.

## IV. CONCLUSION

For the foregoing reasons, the ACLU's motion for disclosure is **GRANTED** in part and **DENIED** in part.

The parties are ordered to allow the ACLU to view the requested exhibits, Pla-1, Pla-1-a, Def-H, Def-I, Def-J, and Def-K, in a reasonable manner consistent with this Ruling and Order no later than **March 31, 2025**.[5]

**SO ORDERED** at New Haven, Connecticut, this 21st day of March, 2024.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[5] Although not expressly addressed in this Ruling and Order, there is no reason that the relief afforded the ACLU herein—the viewing of exhibits Pla-1, Pla-1a, Def-H, Def-I, Def-J, and Def-K—should not also be provided to any member of the public upon timely request. *See Amodeo*, 71 F.3d at 1049 (Courts in this Circuit have "consistently held that the public has an 'especially strong' right of access to evidence introduced in trials.").

17